IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MALINDA DOTSON, | No. C 08-04291 SI |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |
| v. | |
| UNITED STATES OF AMERICA, ET AL, | |
| Defendants. | |

Defendants' motion for summary judgment and plaintiff's motion for leave to amend came on for hearing on May 6, 2011. For the following reasons, the Court GRANTS defendants' motion for summary judgment and DENIES plaintiff's motion for leave to amend.

**BACKGROUND**

Plaintiff has brought this medical malpractice action against four physicians – Dr. Zazueta, Dr. Wallace, Dr. Hamreus and Dr. Strachan (collectively "Hospitalists") – that she alleges treated her in August and September 2006.[1] Plaintiff claims that she should have been given surgical and lytic therapy intervention to treat her deep vein thrombosis, and that as a result of the doctors' failure to provide her those treatments she has post thrombotic syndrome and suffers chronic pain and decreased mobility. Complaint at 8.

On August 12, 2006, Dotson presented at St. Joseph's hospital in Eureka with a complaint of

---

[1] Plaintiff also sued the United States in connection with treatment plaintiff received at a clinic operated by the government. Plaintiff settled her claims against the United States. *See* Docket No. 84.

pain and swelling.[2] On August 13, following a "discussion" with defendant Strachan, she was admitted to the hospital with a diagnosis of deep vein thrombosis (DVT) as well as postpartum hemorrhage. *See* Oppo. MSJ at 4; Exhibit 1 to the Declaration of James A Zito (Docket No. 92), Emergency Dept Admit Note at 2. Plaintiff was also diagnosed with septic pelvic thrombophlebitis. *Id*., Discharge Summary at 1. After several days of treatment with an anticoagulant, Dotson was discharged on August 20, 2006. Oppo. MSJ at 4. Plaintiff's outpatient treatment included antibiotics and anticoagulants. Discharge Summary at 1.

Plaintiff returned to St. Joseph Hospital on September 8, 2006, with complaints of pain in her lower pelvis, fevers and night sweats and was again diagnosed with DVT. Oppo. MSJ at 4. She was admitted on September 9, 2006, as her leg was still edematous and her levels of coumadin were subtherapeutic. Discharge Summary at 1. She was seen by defendant Hamreus, who on September 11th, arranged for a transfer to University of California at San Francisco for potential recannulization procedure, assuming a bed became available. *Id*., at 2-3. Plaintiff was seen by defendant Zazueta on September 12th and 13th. Dr. Zazueta recognized that plaintiff "does need endovascular surgery for recannulization" and was awaiting transfer to UCSF when a bed became available. Ex. 1 to Zito Decl., Progress Record, 9/12 and9/13 Zazueta Notes. Dr. Zazueta also noted that if transfer was a "persistent problem, might consider consultation" with Dr. Palmer, a board certified vascular surgeon in Humboldt County. *Id*., 9/13 Notes. Plaintiff was seen by defendant Wallace on September 14th through 16th, who noted that plaintiff was suspected as having a septic pelvic thrombophlebitis and DVT with subtherapeutic INR levels. Ex. 1 to Zito Decl., Progress Record 9/14 and 9/15, Wallace Notes. Dr. Wallace noted that plaintiff was awaiting transfer to UCSF. *Id*. Plaintiff was again seen by defendant Hamreus on September 17th through September 20th, who noted plaintiff was awaiting transfer to UCSF. *Id*., 9/14 - 9/20 Hamreus Notes.

On September 20th, Dr. Hamreus noted that prospects of transfer to UCSF were "dismal" and recommended seeking another facility. She also spoke with Dr. Palmer who suggested he would explore

---

[2] Dotson was admitted to St. Joseph Hospital on August 4, 2006 to give birth to her second child. She delivered her son without complication on August 5, 2006, and was discharged on August 6, 2006. *See* Complaint at 1; *see also* Opposition to Motion for Summary Judgment (Oppo. MSJ) at 4.

2

the option of doing the procedure at St. Joseph. *Id.* Dr. Palmer requested an infectious disease (ID) consult in order to determine whether plaintiff was septic given her continuing high fevers, which would be a contraindication to surgery for the DVT. *Id.*, at 9/20 notes. The ID consult concluded plaintiff was not septic, in large part due to fact that four blood cultures had come back negative and plaintiff had been off of antibiotics for 12-13 days. Consultation Record at 1, 3-4. On September 21, 2006, Dr. Palmer concluded that at that juncture – given that the thrombus had six weeks to become "organized and get stuck to the vessel wall," the risks of surgery outweighed benefits and the better plan was to discharge plaintiff. Progress Record, 9/21 Palmer Notes. On September 22, 2006 plaintiff was discharged from the hospital.

Following service of a notice of intent to commence action, plaintiff filed her initial medical malpractice complaint against the Hospitalist defendants and an employee of the United States on October 27, 2007 in Humboldt County Superior Court. The case was removed by the federal defendant on April 7, 2008. On May 8, 2008, the complaint against the federal defendant was dismissed without prejudice for failure to comply with the Federal Tort Claims Act, and the claims against the Hospitalists were remanded to Humboldt County Superior Court. The Superior Court case went forward against the Hospitalist defendants, and on September 11, 2008 plaintiff filed a new complaint in this Court against the United States and the Hospitalist defendants. Plaintiff then dismissed her pending state court action.

The Hospitalist defendants now move for summary judgment, arguing that plaintiff has failed to submit sufficient evidence that the defendants breached the standard of care in the treatment of plaintiff or that the treatment plaintiff claims should have been provided – lytic therapy or mechanical thrombectomy – would have improved plaintiff's condition.[3]

Plaintiff opposes defendants' motion and has filed a motion to amend the complaint to include TeamHealth, which plaintiff asserts is defendants' employer, as a named defendant.

---

[3] Defendants also argue that plaintiff's claim is barred by the statute of limitations. The court need not reach this argument, as it grants the motion on defendants' other grounds.

3

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(e) (now Rule 56(c)(2)).

In order to prove a medical malpractice action, the plaintiff must establish: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his/her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. *See Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (Cal. App. 2d Dist. 1999).

4

# DISCUSSION

## I. Motion for Summary Judgment

Defendants move for summary judgment arguing that plaintiff has failed to adduce any admissible expert testimony that two of the Hospitalists provided treatment below the recognized standard of care for plaintiff. Defendants also argue that plaintiff has failed to adduce any competent expert evidence of causation, namely that the interventions plaintiff claims she was entitled to would have been an appropriate treatment and would have improved plaintiff's condition.

### A. Standard of Care

Under California law, "'The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman.'" *Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal. 4th 992, 1001 (1994) (quoting *Landeros v. Flood*, 17 Cal.3d 399, 410 (1976)) (additional internal quotation omitted). Defendants argue that plaintiff has wholly failed to adduce evidence that defendants Strachan or Wallace breached the standard of care with respect to plaintiff.

With respect to Dr. Strachan, the only facts plaintiff cites to with respect to Dr. Strachan's conduct are that the emergency room physician "discussed the case with Dr. Strachan" and "plaintiff was admitted to the Med/Surg ward under Dr. Strachan." Ex. 1 to Zito Decl., Emergency Dept Admit Note at 2-3. Plaintiff points to no progress notes or other evidence that shows that Dr. Strachan actually saw, treated or diagnosed plaintiff. Indeed, plaintiff's own expert – after reviewing the medical notes – agreed that "the record seems to suggest that Dr. Strachan did not actually physically see the patient." Ex B. to Delaney Decl., Badgley Depo. at 90:11-25.

Plaintiff's expert, Dr. Badgley, does not identify any conduct by Dr. Strachan that failed to meet the standard of care, other than his assertion that "[w]ithin the first days of hospitalization, the patient's Hospitalists had a duty to request a vascular surgeon consultation to provide an opinion about emplacement of a vena cava filter." Ex. 8 to Zito Decl., Badgley Rule 26 Report at 7. Dr. Strachan was

5

not deposed by plaintiff and plaintiff identifies no testimony given by Dr. Badgley in his deposition that would support a claim that Dr. Strachan owed or breached a standard of care to plaintiff.

As such, plaintiff has failed to demonstrate that defendant Strachan owed, much less, violated a particular standard of care to plaintiff. There is no evidence that Dr. Strachan ever saw or treated plaintiff. Other than Dr. Badgley's unsupported assertion – included in his declaration in opposition to the motion for summary judgment – that Dr. Strachan should have "known" at the initial diagnosis of DVT "this was the best time to explore endovascular thrombectomy options for the patient" and Dr. Strachan "should have communicated this option to the emergency room physician for documentation in the patient's chart," Badgley Decl. at ¶ 4, there is no evidence that Dr. Strachan was responsible for treatment of plaintiff by virtue of his position or duties at St. Joseph hospital during the time of plaintiff's first admission to the hospital.

With respect to Dr. Wallace, Dr. Badgley did not identify Dr. Wallace at any point in his Rule 26 Report. *See* Exhibit 8 to Zito Decl. Moreover, at his deposition, Dr. Badgley testified that he wasn't ready to render an opinion on whether any care provided by Dr. Wallace was at or below the standard of care. *See* Ex. 7 to Zito Decl., 90:4-10. In his declaration, offered in opposition to the motion for summary judgment, Dr. Badgley says only that in his opinion "each of Malinda Dotson's hospitalist physicians at St. Joseph Hospital did not meet the standard of care with respect to her care and treatment and were negligent," Badgley Decl., ¶ 2, that "each hospitalist (including Dr. Wallace) should have undertaken the opportunity to explore endovascular therombectomy options for the patient", Badgley Decl., ¶ 4, and that Dr. Wallace "saw patient and did nothing to facilitate the transfer [to USCF] or to seek out other treatment options locally or at another tertiary facility for the patient." *Id.* Dr. Badgley's belated opinions about Dr. Wallace are too little too late. Dr. Badgley cannot be unprepared or unready to deliver an opinion during his deposition – when those opinions could be probed and tested by opposing counsel – only to come up with opinions in opposition to a motion for summary judgment which are devoid of any factual underpinning.

For the foregoing reasons, defendants' claims against Dr. Strachan and Dr. Wallace fail for lack of admissible evidence regarding an alleged breach of the standard of care by those doctors.

6

**B.     Causation**

Defendants assert that plaintiff has also failed to provide admissible, expert testimony to create a material issue of fact as to causation. Under California law, "a medical malpractice action, a plaintiff must prove the defendant's negligence was a cause-in-fact of injury." *Jennings v. Palomar Pomerado Health Systems, Inc.*, 114 Cal. App. 4th 1108, 1118 (Cal. App. 4th Dist. 2003). "'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based [on] competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances [that] can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]'" *Id.* (quoting *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal. App. 3d 396, 402–403 (1985)).

Based on the facts of this case, defendants argue that plaintiff has failed to adduce expert testimony that surgical intervention would have occurred during the first hospital stay (when plaintiff had also been diagnosed with septic pelvic thrombophlebitis, a contraindiction for surgery)[4] or that surgery or other intervention around the time of her second hospital stay – approximately one month after the initial DVT diagnosis – would have improved plaintiff's condition. Instead, defendants argue that the only expert testimony establishes that there is no indication that surgery would have improved plaintiff's condition.[5]

In response, plaintiff again relies on the opposition declaration of Dr. Badgley, who is not a vascular surgeon and has no demonstrated experience treating patients with DVT or similar conditions.

---

[4] *See* Delaney Decl., Ex J, Deposition of Dr. Gandhi at 53:6-55:2 (noting that if sepsis was part of diagnosis, surgery would be contraindicated).

[5] *See* Delaney Ex. I, Palmer Depo. at 18:10-19:9 (noting that there is roughly two weeks from appearance of DVT to intervene successfully with surgery, that even during the two-week period there is a progressive loss of success, the success goes "precipitously down" after two weeks, and the standard method of treatment for DVT in September 2006 was anticoagulation medicines).

7

Dr. Badgley opines that "a timely consultation and treatment with a qualified vascular surgeon would have resulted in a different outcome for Ms. Dotson." Badgley Decl., ¶ 3. Dr. Badgley does not explain what "timely" means, but also opines that plaintiff "would have benefit[t]ed from lytic therapy and mechanical thrombectomy if performed early in her second visit to the hospital for her DVT." *Id*. To support his statement, Dr. Badgley relies on the testimony of Dr. Palmer, who indicated that the two week window where surgery has best chance of success is not set in stone and is a continuum. *Id*. However, Dr. Badgley fails to acknowledge Dr. Palmer's statement that after two weeks the "success of the [surgical] intervention goes precipitously down." Palmer Depo. at 18:10-19:9.

Dr. Badgley also relies on the testimony of the United States' expert vascular surgeon Dr. Gandhi who testified that even though the risk-reward ratio was low for performing an "interventional" procedure after six weeks from the appearance of a DVT, "improvement" could still be possible through such measures. Badgley Decl., ¶ 3. Dr. Gandhi, however, testified only that "the probability of having a successful result" at six weeks out would be "low." Finally, Dr. Badgley relies on the fact that UCSF was willing to admit plaintiff for potential surgical intervention, even a month after the initial appearance of the DVT, to support his assertion that surgical intervention could have improved plaintiff's condition. Zito Decl., Ex. 7, Badgley Depo. at 70:1-71:22 (noting that UCSF wouldn't have agreed to accept plaintiff "if they didn't think that there was something within their realm of their – their therapies to help her.").

Taken together Dr. Badgley's opinion – which relies on the partial testimony from the defendants' witnesses and conjecture – is not sufficient to support a prima facie case of causation between Doctors Hamreus or Zazueta's conduct during plaintiff's second admittance at St. Joseph and plaintiff's post thrombotic syndrome. Dr. Badgley cannot support, on the current record, an opinion that it is "more likely than not" that specific therapies not provided by Doctors Hamreus or Zazueta would have probably prevented or lessened plaintiff's post thrombotic syndrome.

## II. Motion for Leave to Amend Complaint

Plaintiff has filed a motion to for leave to amend the complaint to add TeamHealth as the "employer defendant." Docket No. 85. Plaintiff asserts that she only recently discovered that

1  TeamHealth is allegedly the Hospitalist defendants' employer, citing to the June 22, 2010 deposition
2  of defendant Dr. Hamreus. *See* Declaration of James A. Zito [Docket No. 86] ¶ 2. Plaintiff argues that
3  adding in TeamHealth as an employer is important because plaintiff also recently discovered that the
4  optimum time for surgical intervention for DVT is two weeks. Zito Decl., ¶ 4-5 (citing August 19, 2010
5  deposition of Dr. Palmer).

6       Plaintiff's request for leave to amend her complaint is DENIED. This case has been pending
7  since 2008, and trial is set for June 13, 2011. The Court finds it would cause defendants substantial
8  prejudice to allow the amendment to add a new defendant on the eve of trial, as amendment would
9  require a reopening of discovery and substantial delay in the trial. *See, e.g., Solomon v. North Am. Life*
10 *& Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (denying motion to amend made on eve of the
11 discovery cutoff, as allowing the motion would have required re-opening discovery, thus delaying the
12 proceedings).

13      Moreover, as defendants point out, in response to discovery served in the state court action in
14 April 2008, defendant Strachan disclosed that his employer was TeamHealth. *See* Nancy K. Delaney
15 [Docket No. 89], ¶ 4, Ex. C. The other three Hospitalist defendants disclosed in April 2008 that during
16 the relevant time, they were independent contractors with TeamHealth providing "management
17 services." *See, e.g.*, Delaney Decl., ¶ 2, Ex. A. Plaintiff, therefore, has had adequate information about
18 TeamHealth since April 2008 – and could have followed up with additional discovery during the
19 preceding three years – but inexplicably delayed seeking to amend her complaint until far too late. *See,*
20 *e.g., AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (denying
21 motion to amend complaint due to unexplained delay).

22      Finally, plaintiff has not demonstrated good cause to justify the amendment. Instead, it is
23 apparent that plaintiff's goal in seeking to amend her complaint at the last minute is to address a serious
24 deficiency in the current case; that, according to Dr. Palmer's August 2010 testimony, the optimal time
25 for a surgical response to DVT is roughly two weeks after the DVT appears. Here, where none of the
26 named defendants actually *treated* Dotson within the first two weeks after the DVT diagnosis, plaintiff
27 is simply attempting to add new defendants to an old case. Zito Decl., ¶ 4. Moreover, plaintiff had the
28 opportunity to secure her own vascular surgeon expert to help her prepare and bring her case, but she

9

failed to do so. The fact that she found out a supposedly critical piece of information eight months ago, in August 2010, from a defense witness does not justify allowing plaintiff to amend her complaint at this late date.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment and DENIES plaintiff's motion for leave to amend her complaint.

**IT IS SO ORDERED.**

Dated: May 6, 2011

SUSAN ILLSTON
United States District Judge